**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

THERESA BENDER, as Bankruptcy
Trustee for Abdul Alansari,
and ABDUL ALANSARI

      Plaintiff,

vs.                                              4:07-CV-438-SPM

TROPIC STAR SEAFOOD, INC.,

      Defendant.
_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes for consideration upon Defendant's "Motion for Summary Judgment" (doc. 70) and Plaintiff's Response in Opposition (doc. 91). Both parties have also filed Statements of Facts and depositions.

**BACKGROUND**

Plaintiff is a former employee of Defendant corporation. Plaintiff has filed an eight-count complaint alleging the following: 1) race discrimination in violation of Title VII; 2) religious discrimination in violation of Title VII; 3) retaliation in violation of Title VII; 4) race discrimination in violation of the Florida Civil Rights Act; 5) religious discrimination in violation of the Florida Civil Rights Act; 6) retaliation in violation of the Florida Civil Rights Act; 7) retaliation in violation of the Florida Private Whistleblower Act; and 8) retaliation in violation of the Florida Workers' Compensation Act.

Defendant is a seafood distributor, headquartered in Lakeland, Florida, that packages, processes, and distributes seafood throughout Florida, Georgia and Alabama.  Plaintiff is an African American Sunni Muslim.  Plaintiff was the only non-Christian employee in the Tallahassee warehouse where he worked.  However, all of the employees were African American.  Defendant maintained an office in Tallahassee, Florida, in addition to its headquarters in Lakeland.  The Tallahassee office was managed by Jason Jemegan.  Plaintiff began working for Defendant in August 2004 as a "lumper," a truck driver traninee.  On November 18, 2004, Plaintiff was promoted to a full-time truck driver.  He was hired by David Thomas.  Thomas was eventually fired.  Plaintiff's direct supervisor became Corker Wimberly.  Plaintiff's job consisted of arriving at the Tallahassee warehouse between 4:00 a.m. and 6:00 a.m. to load frozen seafood into his truck.  Plaintiff would then drive the truck along the company routes delivering the frozen seafood to customers.  The company routes winded through Tallahassee, Mobile and Jacksonville.

During his employment, Plaintiff allegedly suffered religious and racial discrimination from his co-workers and his supervisor, Corker Wimberly.  Plaintiff alleges that he was harassed and chided because his behavior did not conform to what his coworkers considered typical African American behavior.  On one occassion, Wimberly said to Plaintiff that Plaintiff couldn't eat seafood because it had pork in it.  Additionally, Plaintiff claims that the other Tallahassee drivers pressured Plaintiff to attend a Christian church service with them and then to

eventually convert to Christianity.  They said things like "Come to church. Jesus will save you and you'll feel better."  One particular employee, Anthony Chambers, pressured Plaintiff frequently and he played Christian radio stations in the warehouse in Tallahassee while Plaintiff was there working.  This behavior offended Plaintiff because it contradicted his religious beliefs. Other comments made to Plaintiff include "What's up with the Muslim stuff?" and "come to church" and "stop selling papers and bean pies."  Plaintiff complained about this behavior to David Thomas and then to Corker Wimberly.  While working as Plaintiff's supervisor, Thomas would reprimand the employees for ridiculing Plaintiff.   The religious comments and the gospel music then stopped.  A few months passed, and then Thomas was fired.  After Thomas left the company, the religious comments and the gospel music started again. Plaintiff did not tell anyone else in the company other than  Thomas and Wimberly about the religious harassment that Plaintiff suffered from the other employees.

Plaintiff was often involved in disputes with his supervisors about the condition of the truck that Plaintiff drove.  Plaintiff's truck was the oldest truck in the company's fleet.  Defendant typically gave the oldest truck to the newest driver.  However, on at least one occasion, an employee that was newer than Plaintiff was assigned a truck that was newer and in better condition than Plaintiff's truck.  Plaintiff's total employment time with Defendant was eight months.  Plaintiff reported ongoing and repeating mechanical problems to the

company but he was told that he should "lighten up or he would get fired." Thomas, Plaintiff's first supervisor, did allow Plaintiff to take his truck in for repairs. Plaintiff later discovered that Thomas had been fired because his repair costs were too high. After Thomas was fired, Plaintiff was pressured into driving the truck without making Plaintiff's requested repairs.

On December 7, 2004, a state trooper in Alabama stopped Plaintiff for having faulty equipment on his truck. The trooper told Plaintiff that Defendant company had a long history of safety problems as a result of its bad equipment and faulty trucks. The trooper told Plaintiff to finish his route and that the trooper would send a Department of Transportation report to Plaintiff's employer. Plaintiff believes that as a result of this notification, the company supervisors became more hostile towards Plaintiff.

On January 11, 2005, Plaintiff received a citation for not having tire reflectors on the truck. Wimberly told Plaintiff that he would not install the reflectors. Wimberly instructed Plaintiff to "lie to inspectors" if he was stopped again. Wimberly told Plaintiff to tell the troopers that Plaintiff was on his way to the shop to buy reflectors. On yet another occasion, Plaintiff was stopped by police because he had a broken taillight. Plaintiff knew that the taillight was out because the fuse box was no longer working. When Plaintiff asked Wimberly to repair the fuse box, Wimberly told Plaintiff to replace it with Plaintiff's personal money. Because of his faulty lights and the frequency with which he was stopped for faulty equipment, Plaintiff sometimes slept in his

4

truck during the nighttime hours to avoid being pulled over.  Plaintiff was once stopped at a weigh station for having uneven headlights.  Plaintiff used his own money to purchase replacement lights.

On one occasion, Plaintiff needed a new muffler on the truck.  Wimberly told Plaintiff to fix the situation by tying the muffler to the truck with a wire.  On another occasion, Plaintiff was stopped at a weigh station because exhaust smoke was billowing out of the truck's exhaust system.  Plaintiff's truck had been cited for having an oil leak and during a shift, water leaked through the cab of the truck, damaging documents sitting on the front seat.  Another time, Plaintiff was disciplined because his truck broke down after being in service for twelve hours.  Plaintiff's truck was also cited for having a cracked windshield. Wimberly warned Plaintiff that if Plaintiff kept getting pulled over for mechanical violations, Plaintiff would be fired.  Many other employees had issues with their trucks, but none were terminated, disciplined, or asked to pay for their own repairs. Once, Wimberly crashed a truck but was not asked to pay for the repairs.

Plaintiff also claims that the company encouraged him to violate Department of Transportation regulations by driving for more than eleven hours in a single shift.  When Plaintiff complained about the time that he was required to spend on the road, he was told that he had to work until the truck was unloaded or he would lose his job.  The Department of Transportation required truck drivers to keep a record of their time spent driving. To

circumvent the Department of Transportation regulation about the maximum hours of service, Plaintiff was told to only count his time driving on the highway.  Plaintiff was instructed not to count the time spent loading or unloading his truck.

Plaintiff was required to keep a log book if he traveled more than 200 air miles from his starting point to his destination.  However, he was instructed to lie to the state trooper if he was stopped and he did not have his required log book with him.  Plaintiff was told to tell the state trooper that Plaintiff was lost and that he did not know that he had exceeded his 200-mile limit.  During the times that Plaintiff did keep a log book, it was not sent to Defendant's corporate office because Wimberly felt that Plaintiff was making too many stops.  In fact, Wimberly told Plaintiff to falsify his log book to reflect shorter stops.  When Plaintiff refused to alter his log books, Wimberly told Plaintiff that he would get "a white boy" to take Plaintiff's place.  Another employee also said to Plaintiff that the company already had "a white boy" to replace him.

On May 5, 2005, Plaintiff slipped on a wet floor while making a delivery to a supermarket.  Plaintiff injured his right knee in the fall.  On June 3, 2005, he slipped on a wet floor while making a delivery to a restaurant and he injured his neck, back, and left knee.  On June 13, 2005, Plaintiff sought treatment at Patients First Health Care, an outpatient clinic in Tallahassee.  While waiting in the clinic, Plaintiff received a telephone call from Wimberly telling Plaintiff that the company would not pay Plaintiff's worker's compensation claim for that

injury and resulting treatment.  During the same time, the company's vice president, David Hicks, called the receptionist of the clinic and told her that the company would not pay for Plaintiff's treatment.  The receptionist told Hicks that Plaintiff's injury was work-related and that it would be reported to the company's workers' compensation insurance carrier.  On that same day, Wimberly traveled to the clinic to tell the doctor that Plaintiff would have to use his personal health insurance to cover payment of Plaintiff's visit to the clinic. The doctor told Wimberly that it was illegal for the clinic to bill Plaintiff's personal insurance instead of Defendant's worker's compensation insurance carrier.  Wimberly then told Plaintiff that he cannot keep Plaintiff as an employee because Plaintiff kept getting injured.  Wimberly told Plaintiff that David Hicks told him that Wimberly could not keep Plaintiff on staff. Consequently, Plaintiff's employment was terminated on June 14, 2005. Plaintiff was replaced by a Caucasian driver.

Plaintiff claims that other non-Muslim employees performed worse than Plaintiff, but were not fired.  Another employee, Hamm, was arrested for soliciting a prostitute.  Wimberly did not report this arrest to the company. Hamm lost his driver's license but retained his employment at the company. Plaintiff was required to drive Hamm to Hamm's routes.  Kerry Cline, a white, non-Muslim driver was in an accident in which Cline was determined to be at fault and Cline was not fired.  Cline was, however, warned that after another collision, he would be fired.  Cline then had another accident, two months after

the first one.  Cline was then fired.  Henry Nieuwenhuis, a white, non-Muslim driver for the company, collided with the porch area of a customer's building.  Nieuwenhuis was not fired.  When Nieuwenhuis left the back of his truck unlocked and it resulted in eighty-seven pounds of product being stolen, Nieuwenhuis' employment was then terminated.  Plaintiff believed that Muslim employees were terminated for lesser offenses than non-Muslims.  Additionally, African American employees were terminated for lesser offenses than Caucasian employees.  Plaintiff also claims that Defendant's conduct was willful, wanton, malicious and deliberate.

**STANDARD FOR SUMMARY JUDGMENT**

Plaintiff is suing Defendant under Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act.  Because federal case law regarding Title VII is applicable to claims under the Florida Civil Rights Act, the same analysis will be used for Plaintiff's Title VII claims and his Florida Civil Rights Act claims.  Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1389 (11th Cir. 1998).  Similarly, Plaintiff's Title VII claim of retaliation and his Florida Civil Rights Act claim of retaliation are "substantively similar" and as a result, the Florida Civil Rights claim of retaliation "need not be analyzed separately."  Bernard v. SSA Sec., Inc., 299 Fed. Appx. 927, 929 (11th Cir. 2008).  Accordingly, like the discrimination claim, this Court will focus exclusively on the Title VII analaysis for the retaliation claim.

Federal Rule of Civil Procedure 56(c) provides that summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and

8

admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "For factual issues to be considered genuine, they must have a real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996). For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion. Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989)). An issue is "material" if it might affect the outcome of the case under the governing law. Anderson, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff." Id.

The burden is on the moving party to show that there is no genuine issue of material fact to be determined at trial. Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000). The moving party may meet the burden by showing that the nonmoving party's case is fatally flawed due to a lack of evidence to support an essential element of the nonmoving party's case. Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996). In determining whether the moving party's burden has been met, the court views the evidence and all factual inferences in the light most favorable to the nonmoving party and resolves all reasonable doubts about the

facts in favor of the nonmoving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

If the moving party has satisfied its burden, the burden shifts to the nonmoving party who must show "that summary judgment would be inappropriate because there exists a material issue of fact."  Mullins, 228 F.3d at 1313.  The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence presented by the nonmoving party cannot sustain a genuine issue, summary judgment should be granted. Anderson, 477 U.S. at 249.  The basic inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251.

**ANALYSIS**

Judicial Estoppel

"The equitable doctrine of judicial estoppel precludes a party from asserting a claim in a legal proceeding that is inconsistent with a claim made by that party in a previous proceeding."  Casanova v. PRE Solutions, Inc., 228 Fed. Appx. 837, 840 (11th Cir. 2007) (citations and internal quotations omitted).  "The doctrine bars a plaintiff from pursuing employment discrimination claims for damages that were not disclosed in a prior bankruptcy proceeding, where the plaintiff knew of the claims and had a motive to conceal them from the court."  Id.  For Defendant to succeed on its claim of judicial estoppel it must show that 1) "the allegedly

inconsistent positions were made under oath in a prior proceeding" and 2) that "such inconsistencies must be shown to have been calculated to make a mockery of the judicial system."  Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002).  The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Id. (quoting New Hampshire v. Maine, 532 U.S. 742, 750 (2001)).  As articulated by the Supreme Court, "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle" but courts should consider several factors when determining whether to apply the doctrine in a particular case. See id. (citing New Hampshire, 532 U.S. at 750-51). Specifically, courts should consider the following factors:

> (1) whether the present position is "clearly inconsistent" with the earlier position; (2) whether the party succeeded in persuading a tribunal to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding creates the perception that either court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage on the opposing party.

Id.  This list, however, is not exhaustive; courts may consider additional factors unique to each case. See id. at 1285-86.

    In its motion for summary judgment, Defendant alleges that Plaintiff should be judicially estopped from prosecuting his claim because Plaintiff failed to disclose this lawsuit in his bankruptcy proceedings.  This action was originally filed in state court on February 27, 2006.  Plaintiff filed for bankruptcy on September

29, 2006.  Plaintiff did not disclose the pendency of this lawsuit in either of his bankruptcy petitions or in his creditors' meeting.  However, Plaintiff had no intent to mislead the bankruptcy judge.  In fact, Plaintiff and his counsel cleared up the inconsistency prior to the issue being raised by Defendant.  There was not enough time for Plaintiff to derive an unfair advantage over Defendant because Plaintiff resolved the discrepancy.  Additionally, the bankruptcy proceeding is still ongoing.  As a result, Plaintiff has not profited from the inadvertent omission of this lawsuit during the discussion with the bankruptcy trustee.  Furthermore, Plaintiff did not convince a tribunal to accept the earlier position so that the judicial acceptance of the inconsistent position in a later proceeding would create the perception that either court was misled.  Accordingly, Plaintiff should not be estopped from prosecuting ths action against Defendant.

Disparate Treatment and Hostile Work Environment

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII governs disparate treatment claims (which involve an adverse employment action that is based on the employee's membership in a protected class), hostile work environment claims (in which an employee is subjected to harassment that is based on the employee's membership in a protected class), and retaliation claims. Though Plaintiff's position is somewhat unclear, it appears that he alleges that he

suffered adverse employment actions (disparate treatment), a hostile work environment, and retaliation.

It is always the plaintiff's burden in a Title VII disparate treatment action to demonstrate proof of discriminatory intent.  See Clark v. Huntsville City Bd. of Educ., 717 F.2d 525, 529 (11th Cir. 1983).  To do so, the plaintiff bears the initial burden of proving a prima facie case of each of his three discrimination claims (racial discrimination, religious discrimination, retaliation).  Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination.  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  The initial burden may be satisfied in one of two ways: 1) by presenting direct evidence of discriminatory intent, see Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989), or 2) by presenting circumstantial evidence of discriminatory intent.  Wilson v. B/E Aerospace, Inc.,376 F.3d 1079, 1087 (11th Cir. 2004).  In Title VII discrimination cases based on circumstantial evidence, the McDonnell Douglas[1] burden-shifting framework is applied.[2]

Under the McDonnell Douglas framework, Plaintiff has "the initial burden of establishing a prima facie case for each of his claims."  Keith v. MGA, Inc., 211 Fed. Appx. 824, 827 (11th Cir. 2006).  "Once a prima facie case is established, it

---

[1]  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[2]  Contrary to Plaintiff's claim, the McDonnell Douglas burden-shifting framework is also applied to hostile work environment claims.  See Keith v. MGA, Inc., 211 Fed. Appx. 824, 827 (11th Cir. 2006) (requiring that the plaintiff establish a prima facie case for discriminatory termination, retaliatory termination, and hostile work environment).

raises a presumption that the employer discriminated against the employee, and the employer has the burden to articulate legitimate, nondiscriminatory reasons for the employment decision." Moulton v. Gates, 292 Fed. Appx. 829, 831 (11th Cir. 2008).  At this point, the Title VII defendant does not have the burden of persuasion; it "need not persuade the court that it was actually motivated by the proffered reasons." Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1136 (11th Cir. 1983).  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  Id. If the defendant carries this burden, the plaintiff then bears the ultimate burden of persuading the court that she has been the victim of intentional discrimination.  He may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.  Id.  Thus, in a Title VII case, the burden of persuasion always remains with the plaintiff.

For this Title VII claim, Plaintiff has not provided any direct evidence of discrimination.   Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997).  "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate" constitute direct evidence of discrimination.  Rojas v. Fla., 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002) (citations and quotations omitted). If the alleged statements suggest, but do not prove, a discriminatory motive, then it is circumstantial evidence.

Burrell, 125 F.3d at 1393.

The Court will first address Plaintiff's claims of disparate treatment and hostile work environment.  To establish a prima facie case of disparate treatment, an employee must demonstrate that: 1) he is a member of a protected class; 2) he was subject to adverse employment action; 3) his employer treated similarly situated employees who are not members of the plaintiff's class more favorably; 4) he was qualified for the job or job benefit at issue.  Bennett v. Chatham County Sheriff Dep't, 292 Fed. Appx. 829, 831 (11th Cir. 2008).  To establish a prima facie case of a hostile work environment, an employee must demonstrate that: "(1) he belongs to a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was based on the protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and thus create a discriminatorily abusive work environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious liability."  Wills v. Postmaster Gen., 300 Fed. Appx. 748, 751 (11th Cir. 2008).

In Defendant's motion for summary judgment, it does not dispute that Plaintiff has satisfied the first three factors of the disparate treatment analysis. Plaintiff is a member of a protected class, he was qualified to perform his job duties as a truck driver, and Plaintiff was terminated, which is an adverse employment action.  Defendant only disputes that it treated similarly situated employees who are not members of the Plaintiff's class more favorably than it

15

treated Plaintiff.  Defendant claims that it treated all its employees the same and
that Plaintiff has not met his initial burden of showing that he is indeed similarly
situated to other employees who were treated more favorably.  Plaintiff, however,
claims that Defendant treated Christian employees more favorably than it treated
him as evidenced by Defendant's decision to violate the standard operating
procedures by giving a newer employee a newer truck than the one that Plaintiff
used.  Additionally, Plaintiff claims that other workers who were arrested and who
had traffic accidents were not disciplined in as harsh a way as Plaintiff was
disciplined when he was involved in less serious violations.  In other words,
Plaintiff alleges that Defendant disciplined Plaintiff more harshly than it disciplined
other similarly situated employees outside of Plaintiff's protected group.

  "When the disparate treatment at issue is discipline for the violation of work
rules, the plaintiff must show either (a) that he did not violate the work rule, or (b)
that he engaged in misconduct similar to that of a person outside the protected
class, and that the disciplinary measures enforced against him were more severe
than those enforced against the other persons who engaged in similar
misconduct."  Bennett v. Chatham County Sheriff Dep't, 2008 U.S. App. LEXIS
23897, at *15-16 (11th Cir. Nov. 4, 2008) (citations and internal quotations
omitted). The Eleventh Circuit requires that "the quantity and quality of the
comparator's misconduct be nearly identical to prevent courts from second-
guessing employers' reasonable decisions and confusing apples with oranges."
Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

Plaintiff's employment was terminated because Plaintiff made deliveries late, was the subject of customer complaints, and he caused damage to company property because he allowed fuel to run out of the truck while he was driving it. The quantity and quality of Plaintiff's misconduct is not nearly identical to the misconduct of his comparators. Plaintiff points to no other employees who did the same things that Plaintiff did. Furthermore, Plaintiff did not have any significant amount of work history with Defendant. Plaintiff was employed with Defendant for only eight months. The other employees who received more lenient treatment had been employees for a longer period of time and had built a stronger reputation to rely on than Plaintiff had built. See Moorer v. City of Montgomery, 293 Fed. Appx. 684 (11th Cir. 2008) ("Because the employee was less experienced than his white coworkers, they were not similarly situated and did not serve as valid comparators for the purpose of proving disparate treatment."). Plaintiff cannot meet the fourth prong of the prima facie case of disparate treatment discrimination because he has not presented any employee outside of his protected class who was retained by Defendant despite engaging in conduct similar or more egregious to that for which Plaintiff was terminated. The employees mentioned by Plaintiff were not involved in or accused of the same or similar misconduct as Plaintiff. In fact, the two non-Muslim employees that Plaintiff mentions were eventually fired for their misconduct. Therefore, Plaintiff has failed to demonstrate that the punishment for him, as an African American Sunni Muslim, was harsher than for others outside of either of Plaintiff's protected

classes.

In analyzing Plaintiff's hostile work environment claim, Defendant disputes the forth element of the prima facie case.  Defendant claims that Plaintiff has not demonstrated that the harassment was sufficiently severe as to alter the conditions of Plaintiff's employment and result in an abusive working environment. Determining the severity of a hostile work environment includes a subjective and an objective component.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002).  Clearly the subjective component is satisfied because Plaintiff has brought this suit for the hostile behavior.  However, the objective component is more difficult to prove.  "In determining the objective element, a court looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008) (citations and internal quotations omitted).  The Court has imposed a high standard and taken pains to "ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998)).

The harassment suffered by Plaintiff consisted of comments made by the other employees and sometimes his direct supervisor, Wimberly, about Plaintiff's religion.  Plaintiff alleges that he was ridiculed and teased for being a Muslim. Plaintiff does not clearly state the frequency of these encounters, but Plaintiff does

state that the employees made a "steady and constant stream" of remarks.
However, when listing the specific instances of these remarks made about
Plaintiff's religion, there are less than ten instances over the course of eight
months.  This frequency hardly constitutes a "steady and constant stream."

Plaintiff states that the other employees constantly asked Plaintiff to attend
church with them so that he could "get saved" and they always played Christian
music while at work.  Additionally, Plaintiff views the decision to assign an older,
more dangerous truck to him as evidence of the hostility of the work environment.
Plaintiff also points to an incident when his supervisor, Wimberly, told Plaintiff that
if Plaintiff did not stop making mistakes on the job, that he would be replaced by
"a white boy."  Though understandably annoying and frustrating, these incidents
do not rise to the level of unreasonable interference with Plaintiff's work
performance.  The comments do not seem to occur on a daily or even weekly
basis and they certainly are not physically threatening or humiliating.  Because of
the nature of Plaintiff's job assignment, he is only in the warehouse with the other
employees for approximately two hours a day, or however long it takes for him to
load his truck.  This is not a significant amount of exposure to the petty
annoyances inflicted on Plaintiff by his coworkers.  Additionally, the assignment of
an older truck to him is not evidence of harassment.  The truck was not purchased
specifically for Plaintiff to operate it.  Nor was it tampered with in order to cause
harm or inconvenience to Plaintiff.  Even when taken in the aggregate, and
analyzed in the light most favorable to the Plaintiff, and resolving all reasonable

doubts about the facts his favor, Plaintiff has not met his burden of proving a

prima facie case for hostile work environment on the basis of race or religion.

Retaliation

Plaintiff also brings a retaliation claim under Title VII and the Florida

Whistleblower Act.  The Eleventh Circuit has held that "the summary judgment

analysis for a Title VII retaliation claim should be applied to a claim of retaliatory

discharge under the Florida Whistleblower Act."  Rutledge v. SunTrust Bank, 262

Fed. Appx. 956, 958 (11th Cir. 2008) (citing Sierminski v. Transouth Fin. Corp.,

216 F.3d 945, 950-51 (11th Cir. 2000)).  Therefore, this Court will not conduct a

separate state statutory analysis.

To establish a prima facie case of retaliation, an employee must

demonstrate that "(1) he engaged in statutorily protected activity; (2) he suffered

an adverse employment action; and (3) there is some causal connection between

the two events."  Keith v. MGA, Inc., 211 Fed. Appx. 824, 827 (11th Cir. 2006).

Defendant challenges the third element of the prima facie case.  Defendant

alleges that Plaintiff has presented no evidence that the person responsible for

Plaintiff's termination had any knowledge about Plaintiff's protected activity.

Plaintiff did report the discriminatory comments to his first immediate

supervisor, David Thomas.  As a result, the comments and harassment stopped.

Plaintiff stated that Thomas did not report the comments to his supervisors.

Eventually, after Thomas was replaced by Wimberly, the comments started again.

Reporting comments to Thomas was Plaintiff's protected activity. Jason Coates,

the founder and owner of Tropic Seafood, testified that he made the decision to fire Plaintiff because of Plaintiff's poor work performance. Coates stated that he received complaints from customers about Plaintiff and that another employees reported that Plaintiff had been sleeping on the side of the road on two occasions. Coates testified that he did not know about Plaintiff's complaints about harassment. Even Plaintiff testified that because the harassment was also inflicted on him by his immediate supervisor, Wimberly, there was no one else to whom Plaintiff could report the harassing behavior. Accordingly, there is no causal connection between Plaintiff's protected activity of complaining about harassment to Thomas, who stopped the activity but did not tell his supervisors and Plaintiff's adverse employment action, being fired.

Plaintiff also claims that he was fired in retaliation for filing a workers' compensation claim. However, Coates states that he had no knowledge of Plaintiff's workers' compensation claim until after he had been fired. Plaintiff was fired the day that he went to the outpatient clinic for his injury. This was prior to Plaintiff filing his workers' compensation claim. Though David Hicks and Wimberly knew about Plaintiff's injury and they likely anticipated that Plaintiff would file a workers' compensation claim, there is no evidence that the decision-maker, Jason Coates had the same information. Even when viewing the evidence in the light most favorable to Plaintiff and after resolving factual doubts in his favor, this Court finds that there is no causal connection between Plaintiff's statutorily protected behavior and his termination. Accordingly, Plaintiff has not

established a prima facie case for retaliation.

<u>Florida Workers' Compensation Act</u>

Plaintiff's Complaint also includes a claim that the he was fired in retaliation for filing a workers' compensation claim and that this termination was in violation of the Florida Workers' Compensation Act.[3]  "No employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law."  Fla. Stat. § 440.205.  Defendant's motion for summary judgment states that Plaintiff waived his right to assert his retaliation claim under the Workers' Compensation Act because Plaintiff signed a Release and Waiver of Workers' Compensation Claims Under § 440.20(11)(c)(d) and (e).  Defendant argues that in signing such a release, Plaintiff waived any claims that could be made under the Workers' Compensation Act.

Specifically, the release is a "complete release of all actions against the Release Parties arising out of any Workers' Compensation accident in any way related to any accident or incident while Claimant was employed by employer. . .."  The language in the release is clear and unambiguous.  <u>Patco Transp., Inc. v.</u>

---

[3]  Typically, a federal court does not have jurisdiction over state law claims. However, in accordance with federal statute, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . .."  28 U.S.C. § 1367(a).  The factual basis for this claim is identical to the factual basis for the issues over which this court has original jurisdiction.  Accordingly, this Court chooses to exercise supplemental jurisdiction over these state claims.

Estupinan, 917 So. 2d 922, 923 (Fla. Dist. Ct. App. 1st Dist. 2005).  Plaintiff's

instant claim is for retaliation in violation of the Workers' Compensation Act.  This

claim "arises out of" the Workers' Compensation accident because but for the

accident that serves as the basis for Workers' Compensation claim, there would

not be a retaliation claim.  Accordingly, Plaintiff's claim of retaliation under Florida

Workers' Compensation Act will be denied and Defendant's motion for summary

judgment on that claim will be granted.  Because Plaintiff's evidence cannot

sustain any genuine issues as to any material facts, Defendant is entitled to

judgment as a matter of law.  Accordingly, it is hereby ORDERED AND

ADJUDGED as follows:

    1.    Defendant's motion for summary judgment (doc. 70) is **granted**.

    2.    The clerk shall enter judgment for Defendant Tropic Star Seafood
and against Plaintiff on all of his claims.

    3.    All other pending motions are hereby **denied as moot**.

DONE AND ORDERED on the first of April, 2009.


_s/ Stephan P. Mickle_

Stephan P. Mickle
United States District Judge